IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

RECEIVED

2026 MAR -2 P 1: 08

U.
MI_

| | | |
|---|---|---|
| DIYANA MATHIS, | ) | |
| Plaintiff, | | |
| | ) | **Case No.** 3:26-cv-00111-RAH-CWB |
| | | **3:25-cv-00___-RAH-CWB** |
| v. | ) | (Severed from |
| | | 3:25-cv-00623) |
| | ) | |
| TRANS UNION LLC, | ) | |
| Defendant. | | |

### SECOND AMENDED COMPLAINT

*(Filed Pursuant to Court Order Doc. 32, February 19, 2026)*

### PRELIMINARY STATEMENT

1. *Compliance with Doc. 32.* Plaintiff Diyana Mathis respectfully submits this Second Amended Complaint pursuant to the Court's Order dated February 19, 2026 (Doc. 32). The Court's Order directed three actions: (a) severance of the three Plaintiffs' claims into individual cases; (b) removal of allegations and claims of Plaintiffs Hope Miller and Raheem

1

Sanders; and (c) dismissal of all claims premised upon blank data information fields. This complaint addresses only Plaintiff Mathis's individual claims. No claims premised upon blank data information fields are asserted in this complaint. The surviving claims asserted herein are limited to: (i) fabricated "Last Payment Made: 08/08/2023" dates contradicted by Trans Union's own $0 payment data and by Nelnet federal servicer records confirming no payments were ever made (§1681e(b)); (ii) false 90-to-120-day delinquency codes on accounts the federal servicer confirms required no payment, including four loans discharged by the United States Government ("Paid In Full By Claim") and three loans in "No-Pay Hardship Forbearance" (§1681e(b)); (iii) dissemination of fabricated and false data to six creditors (§1681e(b)); (iv) reinvestigation failures across four CFPB complaints, including timeline violations, verification of fabricated data despite servicer proof of falsity, blanket refusal to reinvestigate, and burden-shifting (§1681i); (v) deceptive trade practices under the Alabama Deceptive Trade Practices Act; and (vi) defamation per se with malice under the §1681h(e) exception. To the extent any reference herein to monetary fields, payment grids, or field-level data appears, such references are made solely as evidence of the falsity of the fabricated payment dates and false delinquency codes that constitute the basis of Plaintiff's surviving claims—not as independent claims premised upon the blank or incomplete status of those fields, which claims remain dismissed pursuant to Doc. 32.

2. *Correction of Prior Pleading Deficiencies.* The Court found the prior pleadings to be "lumped together in a shotgun fashion" and "difficult and confusing to consider." Doc. 32 at 4. Plaintiff recognizes that the prior filing was unnecessarily voluminous and imposed an undue burden on the Court's limited judicial resources. This Second Amended Complaint

2

has been restructured to cure those deficiencies in full. It presents only Mathis's individual claims, in a concise and sequentially organized format, with each allegation distinctly stated to conserve judicial resources, to facilitate efficient case management, and to permit Defendant to respond to each paragraph with specificity as required by Federal Rule of Civil Procedure 8(b).

3. *Scope of Claims.* All claims asserted herein were contained in the First Amended Complaint (Doc. 29), which the Court allowed as filed except for the blank-field claims. Doc. 32 at 4 ("the First Amended Complaint (doc. 29) is ALLOWED as filed except for the claims based on the blank information fields"). This Second Amended Complaint does not add new claims; it reorganizes the allowed claims into a clear, individually-stated format with proper count headings as the Court's severance order contemplates. No claim in this complaint is premised upon the blank or incomplete status of any data information field. Every claim traces to fabricated payment dates, false delinquency codes contradicted by federal servicer records, or reinvestigation failures—not to the status of any data field.

## PARTIES

1. Plaintiff Diyana Mathis ("Mathis") is a natural person and citizen of the State of Alabama, residing at 404 Brown Street, Tuskegee, Alabama 36083. Mathis has been employed as a Drug and Alcohol Abuse Counselor by Conversion Rep LLC since October 4, 2021. Mathis has received four promotions in under four years. Mathis currently serves as Quality Assurance Department Team Lead, a position she has held since July 7, 2025. Mathis's professional objective is to establish a family-owned Drug and Alcohol Abuse

Rehabilitation Center, an enterprise that requires substantial capital financing. Trans Union's defective credit reporting directly impedes Mathis's ability to obtain financing on commercially reasonable terms and thereby impairs both her present financial standing and her capacity to pursue the foregoing professional objective.

2. Defendant Trans Union LLC ("Trans Union") is a Delaware limited liability company with its principal place of business at 555 West Adams Street, Chicago, Illinois 60661. Trans Union is a founding member of the Consumer Data Industry Association ("CDIA"), served on the Metro 2® Task Force, and participated in drafting the Credit Reporting Resource Guide® ("CRRG"). Trans Union regularly conducts business throughout the Middle District of Alabama.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) because this action arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*

4. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a) because those claims arise from the same nucleus of operative facts as the federal claims.

5. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

A. *Statutory Framework: The CARES Act and Mandatory Suspension of Federal Student Loan Obligations*

6. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281, mandated the automatic suspension of all federal student loan payments: "The Secretary shall suspend all payments due for loans made under part D and part B (that are held by the Department of Education) of title IV of the Higher Education Act of 1965 (20 U.S.C. 1087a et seq.) through September 30, 2020." CARES Act § 3513(a)(1). The payment suspension was extended by subsequent executive action through September 30, 2023—forty-three months of mandatory federal deferment affecting approximately 43 million borrowers. No borrower action was required. No servicer discretion was permitted. Trans Union possessed actual knowledge of this mandatory payment suspension and the corresponding credit reporting obligations imposed by Section 3513(d).

7. Section 3513(d) of the CARES Act mandated specific credit reporting treatment: "The Secretary shall ensure that, for the purpose of reporting information about the loan to a consumer reporting agency, any payment that has been suspended under this section is treated as if it were a regularly scheduled payment made by the borrower." Suspended payments must be treated "as if" they were payments made—meaning Amount Past Due must equal $0, and the account must reflect Current status with appropriate deferment coding. Trans Union possessed actual knowledge of this federal mandate.

8. The fabricated "Last Payment Made: 08/08/2023" date on all three of Mathis's tradelines falls within the CARES Act mandatory deferment period (March 2020 through September 2023). During this period, no payments were due on Mathis's federal student loans by

operation of federal law. The fabrication of a payment date during a period when federal law prohibited payment obligations is irreconcilable with the statutory mandate and constitutes a categorical impossibility. Where a consumer reporting agency publishes such fabricated data to third-party creditors, the resulting harm bears a "close relationship to the harm associated with the tort of defamation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021). As set forth in Section F below, Trans Union published the fabricated data to six creditors.

**B. *Congressional Notice of Systemic Noncompliance***

9. In May 2020, Members of Congress sent formal correspondence to Trans Union and other consumer reporting agencies identifying systemic deficiencies in credit reporting practices affecting federal student loan borrowers. The correspondence specifically addressed reports that consumer reporting agencies were failing to properly reflect the protected status of federal student loans under the CARES Act, causing widespread harm to millions of borrowers. Trans Union was placed on explicit notice—by Members of the United States Congress—that its student loan credit reporting practices were causing harm on a systemic, nationwide scale and required immediate correction. Trans Union received this Congressional correspondence and was thereby placed on actual notice of the systemic nature of the violations alleged herein.

10. Despite this Congressional warning—which identified the precise category of violations alleged herein—the violations affecting Mathis persisted for an additional five years and continue to the date of this filing. Trans Union's failure to correct its data processing systems after receiving Congressional notice constitutes compelling evidence of willful noncompliance and reckless disregard for consumer rights.

C. *Industry Standards: The Metro 2® Format and Trans Union's Authorship Thereof*

11. The Metro 2® Format is the industry-standard data specification for furnishing consumer credit information to consumer reporting agencies. The format is maintained by the Consumer Data Industry Association ("CDIA") and published in the Credit Reporting Resource Guide® ("CRRG"). The FCRA was enacted to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit . . . in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. § 1681(b); *Philbin v. Trans Union Corp.*, 101 F.3d 957, 962 (3d Cir. 1996). Trans Union is not a passive recipient of these standards. Trans Union is a founding member of CDIA, served on the Metro 2® Task Force that developed the format, and participated in drafting the CRRG itself.

12. The CRRG establishes mandatory programming standards at Section 3-3, including: "Every numeric field is right-justified and zero filled;" "If a numeric field is not available, it should be zero filled;" and "If a monetary field is not applicable, it should be zero filled." CRRG at 3-4. The CRRG concludes this section with an unambiguous warning: "Any deviation from these standards jeopardizes the integrity of the data." CRRG at 3-4. This industry-adopted warning—published by the organization Trans Union helped found and drafted—establishes that Trans Union possessed actual knowledge that deviations from Metro 2® standards compromise data integrity.

13. The CRRG specifies that Field 18 (Date of Last Payment) must correlate with Field 26 (Actual Payment Amount). A "Date of Last Payment" may only be populated when a corresponding non-zero payment appears in the payment history grid. This internal

7

consistency requirement is fundamental to Metro 2® data integrity. As a Metro 2® Task Force participant, Trans Union possessed direct knowledge of this correlation requirement—the same requirement it violated on all three of Mathis's tradelines. Trans Union's violation of a data integrity standard it participated in drafting constitutes a failure to follow its own procedures within the meaning of *Williams*, 947 F.3d at 1309.

14. The CRRG provides specific guidance for federal student loan reporting at Chapter 13 (Student Loan Reporting – Federal Loans). For loans in deferment or forbearance when no payments are due, the CRRG specifies: Terms Frequency = D (deferred); Scheduled Monthly Payment Amount = $0 (zero-filled); Account Status = 11 (Current); Amount Past Due = $0; and appropriate Special Comment codes including PDE (Payment Deferred). CRRG at 13-4, 13-10. Trans Union co-authored these specific reporting requirements and is charged with knowledge of their content.

**D. *The Disputed Tradelines and Reported Data***

15. Trans Union's consumer disclosure report contains three DEPT OF ED/NELNET student loan tradelines with fabricated payment data, as follows:

| # | Account Prefix | Opened | Balance | Pmt Rec'd | Last Pmt | Aug 2023 Grid |
|---|---|---|---|---|---|---|
| 1 | 90000051251 | 09/22/2015 | $3,909 | $0 | 08/08/2023 | $0 paid |
| 2 | 90000051251 | 09/22/2015 | $2,540 | $0 | 08/08/2023 | $0 paid |
| 3 | 90000052134 | 03/14/2016 | $5,035 | $0 | 08/08/2023 | $0 paid |

**E. *Internal Data Contradictions and Federal Servicer Proof of Falsity***

16. All three accounts report "Last Payment Made: 08/08/2023" in the account header. Simultaneously, the same disclosure reports "Payment Received: $0" on all three tradelines. The payment history grid for every month shows Amount Paid = $0 and Scheduled Payment = $0. A "Last Payment Made" date represents a date on which a

8

payment was received. Trans Union's own disclosure data is internally self-contradictory: "Last Payment Made: 08/08/2023" appears alongside "Payment Received: $0," "Amount Paid: $0" (every month), and "Scheduled Payment: $0" (every month). These data points—on the same tradeline, in the same report, generated by the same Trans Union systems—are mutually exclusive. The reported "Last Payment Made: 08/08/2023" is irreconcilable with the simultaneously reported "Payment Received: $0" on each of the three tradelines. See Doc. 29-3 (Exhibit B-3 to the First Amended Complaint).

17. Under the CRRG, Field 18 (Date of Last Payment) may only be populated when a corresponding non-zero payment appears in the payment history. Since the payment grid shows $0 for every month, the "Last Payment Made" field should contain no date.

18. Nelnet, the federal loan servicer for all three accounts, issued a Loan Summary dated January 18, 2026 (Exhibit S-1), confirming: "Current Amount Due: $0.00" and "Past Due Amount: $0.00." Nelnet's Payment History report (Exhibit S-2) categorically states: "No payments have been made to your Nelnet-serviced account at this time." Nelnet's records constitute the definitive certification of the federal loan servicer that no payment has ever been made on any of Mathis's accounts. Trans Union's reported "Last Payment Made: 08/08/2023" is contradicted by the federal loan servicer's records.

19. The Nelnet Loan Summary (Exhibit S-1) establishes that Trans Union's reporting is legally and factually impossible. Mathis's Nelnet account contains seven federal student loans. Their statuses are as follows:

    (a) **Four Loans Discharged by the United States Government.** Loans 4 through 7 (account numbers ending in 2591, 2691, 9491, and 9591) carry a Nelnet-assigned status of "Paid In Full By Claim." This designation signifies that the United States

Department of Education discharged the underlying obligation. The federal government satisfied the debt in its entirety. The current balance on each loan is $0.00. No principal remains outstanding. No interest continues to accrue. No scheduled payment exists. No past due amount exists. No debt remains upon which a delinquency can be predicated. These four loans have been extinguished as obligations by an act of the federal government. Trans Union reported 90-to-120-day delinquency on accounts whose underlying debts have been satisfied in their entirety by the United States Government. No objectively reasonable interpretation of the FCRA permits the reporting of delinquency on a discharged obligation. See *Safeco*, 551 U.S. at 69.

(b) **Three Loans in No-Pay Hardship Forbearance.** Loans 1 through 3 (account numbers ending in 9594, 9694, and 1692) carry a Nelnet-assigned status of "No-Pay Hardship Forbearance" with a Status End Date of February 8, 2026. The designation "No-Pay" signifies that no payment is required, no payment is expected, and no payment is due. The current amount due on each loan is $0.00. The past due amount on each loan is $0.00. A consumer cannot be reported as delinquent on an account that the federal servicer has expressly designated as requiring no payment. The "No-Pay" designation is facially incompatible with any report of delinquency.

(c) Across all seven loans: zero dollars are past due, zero dollars are currently due, zero payments have ever been made, and zero payments have ever been required. Four of the seven loans have been fully discharged by the federal government—the underlying obligations no longer exist. The remaining three are in a forbearance

10

status that expressly prohibits payment obligations. There is no permutation of these facts—no interpretation, no data processing logic, no furnisher transmission—under which a "Last Payment Made" date can exist or under which 90-to-120-day delinquency can be reported. The data Trans Union published to six creditors is irreconcilable with the loan statuses, payment histories, and servicer certifications maintained by the United States Department of Education through its authorized servicer, Nelnet.

(d) Nelnet services all seven of Mathis's federal student loans under a single master account (Account EXXXXX7478). See Exhibit S-3. Trans Union's consumer disclosure reports only three tradelines (account numbers 90000051251, 90000051251, and 90000052134). The mapping between the seven underlying Nelnet loans—four discharged and three in no-pay forbearance—and the three Trans Union tradelines is not apparent from either record set. It cannot be determined from Trans Union's consumer disclosure which tradelines correspond to the four loans discharged as "Paid In Full By Claim" and which correspond to the three loans in "No-Pay Hardship Forbearance." Trans Union nevertheless reports identical data on all three tradelines—including the identical fabricated "Last Payment Made: 08/08/2023" date—without differentiating between discharged and active accounts. This bundling opacity renders Trans Union's reporting unverifiable and demonstrates that Trans Union's procedures are incapable of accurately reporting the status of individual federal student loans when the furnisher bundles multiple loans under a single account.

11

20. Trans Union's reporting of Mathis's student loan accounts is contradicted by three independent categories of evidence, each independently sufficient to establish inaccuracy under 15 U.S.C. § 1681e(b): (a) Trans Union reports a "Last Payment Made: 08/08/2023" date on accounts where the federal loan servicer's definitive records confirm no payment has ever been made—neither on that date nor on any other date; (b) Trans Union reported 90-to-120-day delinquency codes on accounts that the federal loan servicer has confirmed had no payments due, creating a materially false impression of severe delinquency where no delinquency could legally exist; and (c) Trans Union reports delinquency on accounts that either no longer exist as debts because the United States Government discharged them ("Paid In Full By Claim") or that the federal servicer has expressly designated as requiring no payment ("No-Pay Hardship Forbearance"). The convergence of all three categories of contradiction—on the same tradelines, in the same report, disseminated to six creditors—establishes that Trans Union's reporting procedures are structurally incapable of producing results consistent with maximum possible accuracy as required by 15 U.S.C. § 1681e(b) with respect to federal student loan data. Under *Safeco*, 551 U.S. at 69, no "objectively reasonable" reading of the FCRA permits a consumer reporting agency to report delinquency on obligations discharged by the federal government. The Eleventh Circuit has held that reports can be "inaccurate" under FCRA when they are materially incomplete or misleading. Erickson v. First Advantage Background Services Corp., 981 F.3d 1246 (11th Cir. 2020); Pedro v. Equifax, Inc., 868 F.3d 1275 (11th Cir. 2017).

21. The identical fabricated date "08/08/2023" appears on all three of Mathis's tradelines despite the payment grid showing $0 paid across every month on every account. The same

12

fabricated date also appears on the accounts of Raheem Sanders—a separate consumer with separate accounts serviced by the same furnisher. The replication of an identical date unsupported by any payment record across tradelines belonging to two unrelated consumers—each with separate account numbers, balances, and reporting histories—is inconsistent with isolated human error and is consistent only with a systemic defect in Trans Union's automated data processing systems. Where inaccuracies result from systemic processing failures rather than isolated errors, the consumer reporting agency's procedures are unreasonable as a matter of law. See *Cahlin*, 936 F.2d at 1156; *Losch*, 995 F.3d at 944.

## F. *False Delinquency Reporting Contradicted by Federal Servicer Records*

22. Trans Union reported 90-day delinquency codes beginning August 2019 on all three tradelines. Nelnet, the federal loan servicer, has confirmed that Mathis's first payment of $196.02 was due on May 26, 2019, and that no payments were received, resulting in delinquency that Nelnet states was accurately reflected at the time it was furnished. See Exhibit S-3 (Nelnet CFPB Response, December 19, 2025). However, Nelnet's current records establish that four of the seven underlying loans have been discharged by the United States Government ("Paid In Full By Claim") and the remaining three are in "No-Pay Hardship Forbearance" with $0.00 currently due and $0.00 past due. Trans Union's consumer disclosure does not reflect these current statuses. Trans Union continues to report historical delinquency codes alongside a fabricated "Last Payment Made: 08/08/2023" date on accounts whose underlying obligations have been extinguished or placed in no-pay status by the federal government.

13

23. Trans Union reported 120-day delinquency codes for September 2019 through February 2020 (six consecutive months) on all three tradelines. On March 13, 2020, the COVID-19 administrative forbearance was applied to Mathis's account, bringing all loans current. See Exhibit S-3. Trans Union's report reflects this transition from 120-day delinquency to Current status in March 2020 but contains no Special Comment Code (Field 19) explaining how accounts that were 120 days delinquent became current in a single month—a material omission that renders the delinquency reporting misleading to any creditor reviewing the report. The absence of a Special Comment Code explaining the March 2020 transition is a Metro 2® violation independent of the fabricated payment date.

24. In total, Trans Union reported seven months of delinquency per tradeline across all three accounts. Trans Union's reporting of that delinquency is materially false in context: the delinquency history is presented alongside a fabricated "Last Payment Made: 08/08/2023" date that Nelnet categorically contradicts, on accounts whose underlying loans have been discharged by the federal government or placed in no-pay forbearance, without Special Comment Codes explaining account transitions. The combination of false delinquency codes with a fabricated payment date creates a materially misleading report that no reasonable creditor could accurately interpret.

25. Nelnet's CFPB response (Exhibit S-3) confirms that Mathis's first payment of $196.02 was due May 26, 2019, and that no payments were received. Nelnet states the delinquency reporting from August 2019 through February 2020 was accurate at the time it was furnished. However, Nelnet's current Loan Summary (Exhibit S-1) shows that four of Mathis's seven loans are now "Paid In Full By Claim" and three are in "No-Pay Hardship

Forbearance" with $0.00 currently due and $0.00 past due. Trans Union's consumer disclosure does not reflect these current statuses. A consumer reporting agency that continues to report a fabricated "Last Payment Made" date alongside historical delinquency codes—when the federal loan servicer confirms no payment was ever made and the underlying loans have been discharged or placed in no-pay forbearance—has failed to follow reasonable procedures to assure maximum possible accuracy. See 15 U.S.C. § 1681e(b); *Losch*, 995 F.3d at 944.

26. Trans Union reported that Mathis was 90-to-120 days delinquent on accounts that the federal loan servicer has confirmed required no payment—an internal inconsistency between the reported delinquency status and the servicer's definitive records. A delinquency code on an account where the servicer confirms no payment was ever due or made is not merely incomplete—it is affirmatively false. See *Losch*, 995 F.3d at 944–45 (procedures unreasonable where agency has reason to believe information is unreliable).

### G. *Third-Party Dissemination and Resulting Adverse Credit Actions*

27. Trans Union disseminated consumer reports containing the fabricated payment date, false delinquency codes, and materially misleading credit data to the following creditors:

| # | Creditor | Date | Purpose / Harm |
|---|----------|------|----------------|
| 1 | NCC Perkins Motor Plex | 11/30/2023 | Automobile dealership; Trans Union disseminated consumer report for credit transaction |
| 2 | Huntington Bank | 11/30/2023 | Automobile financing institution; contemporaneous inquiry with two additional creditors |
| 3 | Ally Financial | 11/30/2023 | Automobile financing institution; third contemporaneous inquiry on same date |
| 4 | First Premier Bank | 12/27/2023 | Subprime credit card issuer (APR exceeding 30%); |

| | | | inquiry occurred 27 days after mainstream creditor inquiries |
|---|---|---|---|
| 5 | Family Security CU | 12/29/2023 | Credit union; inquiry two days following First Premier Bank inquiry |
| 6 | Capital One | 05/19/2024 | Credit card issuer; most recent third-party dissemination in the record |

28. Each of the six disseminations identified in Paragraph 27 conveyed a consumer report containing: (a) the fabricated "Last Payment Made: 08/08/2023" on all three student loan tradelines, contradicted by $0 payment data on the same tradelines; (b) seven months of false delinquency history (90-to-120 days) on accounts that the federal loan servicer has confirmed required no payment and on which four underlying loans have been discharged by the United States Government; and (c) the absence of Special Comment Codes explaining the transition from 120-day delinquency to Current status in March 2020, rendering the delinquency reporting misleading to any creditor reviewing the report.

29. On November 30, 2023, three creditors—NCC Perkins Motor Plex, Huntington Bank, and Ally Financial—simultaneously accessed Mathis's Trans Union file in connection with an automobile financing transaction. Within twenty-seven days, on December 27, 2023, Mathis's next credit inquiry was from First Premier Bank, a known subprime credit card issuer with annual percentage rates exceeding 30%. The progression from three mainstream creditors to a subprime lender within twenty-seven days is consistent with a pattern of credit denials attributable to the false delinquency reporting and fabricated payment data on Mathis's Trans Union consumer file. The foregoing pattern of credit inquiries constitutes circumstantial evidence of adverse credit actions attributable to the

inaccuracies in Mathis's Trans Union consumer file. See Doc. 29-3 (Exhibit B-3 to the First Amended Complaint).

**H.** *Failure to Maintain Reasonable Procedures Under 15 U.S.C. § 1681e(b)*

30. Trans Union failed to follow reasonable procedures to assure maximum possible accuracy as required by 15 U.S.C. § 1681e(b). To establish a claim under § 1681e(b), a plaintiff must show that: (1) the consumer report contained inaccurate information; and (2) the reporting agency failed to follow reasonable procedures to assure maximum possible accuracy. *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991). A reporting agency's procedures are unreasonable where the agency "has a reason to believe that the information supplied to it by a data furnisher is unreliable." *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 944 (11th Cir. 2021). Here, Trans Union had every reason to know its own data was unreliable—because its own payment data contradicted its own header fields on the same tradeline. Specifically, Trans Union failed to:

    (a) cross-reference the "Last Payment Made" header field against the payment history grid—a standard automated validation that would have detected the $0 contradiction on all three accounts;

    (b) cross-reference delinquency codes against servicer records and current account statuses, which would have revealed that four underlying loans had been discharged by the federal government and three were in no-pay forbearance—statuses facially incompatible with the reported delinquency;

    (c) implement quality-control procedures that would flag internally contradictory data—a "Last Payment Made" date appearing alongside $0 received, $0 paid, and $0

scheduled, and delinquency codes appearing on accounts the servicer confirms required no payment; and

(d) conduct any meaningful reinvestigation when Mathis identified these exact violations in her CFPB disputes and provided Nelnet servicer records categorically proving no payments had ever been made.

31. Cross-referencing a header field against the corresponding payment data is a fundamental data integrity check. Trans Union processes credit data for over 200 million consumers. The absence of this threshold validation procedure demonstrates systemic procedural failure. Where, as here, the inaccuracy is detectable from the face of Trans Union's own records—without reference to any external source—the failure to detect it is per se unreasonable as a matter of law. See *Losch*, 995 F.3d at 944–45; *Cahlin*, 936 F.2d at 1156.

### I. *Consumer Financial Protection Bureau Dispute and Reinvestigation Failures*

Under 15 U.S.C. § 1681i(a), when a consumer disputes information in the consumer's file, the consumer reporting agency must "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." The FCRA's investigation provisions "evince Congress's intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear grave responsibilities to ensure the accuracy of that information." *Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997). A reinvestigation "must consist of something more than merely parroting information received from other sources," and "a reinvestigation that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.*; accord

*Cortez v. Trans Union LLC*, 617 F.3d 688, 713 (3d Cir. 2010); *Stevenson v. TRW Inc.*, 987 F.2d 288, 293 (5th Cir. 1993).

32. ***CFPB Complaint No. 251208-26635675 (December 8, 2025).*** Mathis filed a CFPB dispute identifying the fabricated payment dates, false delinquency codes, and internal data contradictions, and providing Nelnet servicer records (Exhibits S-1 and S-2) proving that no payments had ever been made. Trans Union responded January 14, 2026—37 days later, exceeding the 30-day deadline by 7 days. Trans Union's response was untimely, exceeding the thirty-day statutory deadline imposed by 15 U.S.C. § 1681i(a)(1)(A) by seven days. Trans Union's response contained the following verbatim statement of actions taken:

"In response to your request, the following actions were taken on your credit file: You disputed the following Personal Information on your credit file. Below includes the actions taken: Address — UPDATED. You disputed the following accounts and/or public records on your credit file. Below includes the results of that investigation. DEPT OF ED / NELNET — ACTIVE DISPUTE (3). PORTFOLIO RECOVERY — ACTIVE DISPUTE. CHIME STRIDE BANK — ACTIVE DISPUTE. Other miscellaneous actions taken based on your request were: Opt Out — ADDED."

33. Trans Union's response is significant in three respects. First, Trans Union reviewed Mathis's entire consumer file—including non-student-loan accounts (Portfolio Recovery and Chime Stride Bank)—and flagged all disputed accounts as "ACTIVE DISPUTE," yet made no substantive corrections to any tradeline, including the three student loan tradelines for which Mathis provided categorical servicer proof of falsity. Second, Trans Union affirmatively modified Mathis's file during the reinvestigation—updating her

19

mailing address and adding an opt-out preference—demonstrating that Trans Union actively processed the dispute and accessed the consumer file, but affirmatively declined to correct the fabricated payment dates or the false delinquency codes. Third, the "ACTIVE DISPUTE" notation is neither a verification, a correction, nor a deletion—it is a procedural placeholder that leaves demonstrably false data on the consumer's file in violation of 15 U.S.C. § 1681i(a)(5)(A), which requires that information that "cannot be verified" must be "promptly deleted." See Exhibit C.

34. *CFPB Complaint No. 251227-27213175 (December 26, 2025).* Mathis filed a second CFPB complaint against Trans Union identifying Metro 2 field-level violations on the same three DEPT OF ED/NELNET tradelines, including: (a) Field 18 (Date of Last Payment) reporting a static date of August 8, 2023 across 69 monthly reporting instances while balances simultaneously changed; (b) Field 17A (Account Status) reporting "X" (Unknown) for 17 consecutive months while simultaneously reporting PDE deferment status, specific balance amounts, and $0 scheduled payments; (c) the absence of any Field 19 Special Comment Code explaining the transition from 120-day delinquency to Current status in March 2020; and (d) a complete data gap for January 2025 across all three tradelines. Trans Union responded on January 28, 2026. Trans Union's response was substantively identical to its response to CFPB Complaint No. 251208-26635675: "DEPT OF ED / NELNET — ACTIVE DISPUTE (3). PORTFOLIO RECOVERY — ACTIVE DISPUTE." Trans Union made no corrections to any tradeline despite this being the second CFPB complaint identifying inaccuracies on the same tradelines. See Exhibit C.

35. Trans Union's response to CFPB Complaint No. 251227-27213175 is independently significant. Mathis had now filed two separate CFPB complaints—on December 8, 2025

and December 26, 2025—identifying overlapping but distinct categories of inaccuracy on the same three student loan tradelines. Trans Union responded to both complaints by noting "ACTIVE DISPUTE" and making zero corrections to any tradeline. The repetition of the identical non-corrective response to a second, independently documented dispute constitutes a separate failure to conduct a reasonable reinvestigation under 15 U.S.C. § 1681i(a)(1)(A). See *Cushman*, 115 F.3d at 225.

36. ***CFPB Complaint No. 251227-27213236 (December 26, 2025) — Portfolio Recovery Associates Account No. 517805968851.*** This dispute identified seven specific inaccuracies on a Portfolio Recovery Associates collection tradeline:

    (a) Missing Date of First Delinquency ("DOFD") — the DOFD is not displayed on Mathis's Trans Union consumer disclosure, depriving Mathis of her statutory right under 15 U.S.C. § 1681c(c)(1) to verify the accuracy of the removal date calculation;

    (b) Cross-Bureau Discrepancy — Trans Union reports a removal date of September 2029, while Equifax reports a removal date of July 2029 with a DOFD of October 27, 2022—a two-month discrepancy establishing that at least one consumer reporting agency is reporting an incorrect DOFD-derived removal date;

    (c) Missing Original Account Number (Metro 2® Field 31) — the Original Creditor is listed as Capital One N.A. but no Original Account Number is provided, rendering verification of the chain of custody from original creditor to debt buyer impossible;

    (d) Incorrect Account Type Classification (Metro 2® Field 6) — the Account Type is reported as "Open Account" (Code O), which is incorrect for a purchased

21

collection account that should be classified as "Collection Account" (Code Y) or "Purchased Receivable" (Code 2A);

(e) Vague Loan Type (Metro 2® Field 5) — the Loan Type is reported as "FACTORING COMPANY ACCOUNT," which does not identify the underlying debt type (credit card, revolving, etc.) and is materially misleading;

(f) Twenty-Four Months of Missing Payment History — the account was opened June 20, 2023, yet no payment history entries exist for the entire 24-month period through the last update of June 29, 2025; and

(g) Nine-Month Undocumented Chain of Custody Gap — the DOFD is approximately September/October 2022, but the Portfolio Recovery account was not opened until June 20, 2023—a nine-month period during which the custody, ownership, and servicing of the underlying debt is entirely undocumented.

37. Trans Union responded to CFPB Complaint No. 251227-27213236 on January 26, 2026 with: "Company responded there is litigation involved." Trans Union conducted no reinvestigation of any of the seven documented inaccuracies on the Portfolio Recovery tradeline. There is no "litigation exception" under 15 U.S.C. § 1681i. The statute mandates reinvestigation when a consumer disputes information, without exception for pending litigation. Trans Union's refusal to reinvestigate constitutes a willful violation of § 1681i(a)(1)(A), actionable under 15 U.S.C. § 1681n. See Exhibit C.

38. *CFPB Complaint No. 251227-27213448 (December 26, 2025).* Mathis filed a third CFPB complaint on December 26, 2025 disputing six hard inquiries appearing on her Trans Union consumer file, including inquiries from Capital One, Family Security Credit Union, First Premier Bank, Ally Financial, Huntington Bank, and NCC Perkins Motor

Plex. Trans Union responded on January 28, 2026 with a form letter stating that inquiries remain on a consumer's report for two years and directing Mathis to contact the inquiring companies directly. Trans Union conducted no reinvestigation as to whether each inquiry was supported by a permissible purpose under 15 U.S.C. § 1681b(a) or whether Mathis had authorized each credit pull. Directing the consumer to contact the inquiring entities directly constitutes the "burden-shifting" reinvestigation that *Cushman* holds violates § 1681i. 115 F.3d at 225. See Exhibit C.

39. Trans Union's responses to Mathis's four CFPB complaints reveal a pattern of escalating noncompliance. In response to the first complaint (No. 251208-26635675, December 8, 2025), Trans Union noted "ACTIVE DISPUTE" and made no corrections despite receiving Nelnet servicer records. In response to the second complaint (No. 251227-27213175, December 26, 2025), Trans Union again noted "ACTIVE DISPUTE" and again made no corrections. In response to the third complaint (No. 251227-27213236, December 26, 2025), Trans Union refused to reinvestigate entirely, citing "litigation involved." In response to the fourth complaint (No. 251227-27213448, December 26, 2025), Trans Union shifted the burden of reinvestigation to the consumer by directing Mathis to contact the inquiring companies directly. Each response independently violates 15 U.S.C. § 1681i(a)(1)(A). The progression from inadequate reinvestigation to outright refusal to burden-shifting constitutes compelling evidence of willful noncompliance. See Exhibit C.

40. In its reinvestigation of CFPB Complaint No. 251208-26635675, Trans Union did precisely what *Cushman* prohibits: it "merely parrot[ed] information received from other sources" without independently evaluating whether the data in its own files was internally

consistent. 115 F.3d at 225. Trans Union possessed categorical proof from the federal loan servicer that no payments had ever been made—yet noted "ACTIVE DISPUTE" without cross-referencing its own records or the servicer evidence provided. Trans Union affirmatively modified Mathis's address and added an opt-out preference—demonstrating active file access—while leaving the fabricated payment dates and false delinquency codes untouched. A reinvestigation that modifies peripheral data while declining to address the substantive inaccuracies identified by the consumer and supported by categorical servicer proof is the archetype of the "burden-shifting" reinvestigation Congress intended to prohibit. See *Cushman*, 115 F.3d at 225; see also *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1336 (11th Cir. 2015). Trans Union's reinvestigation of CFPB Complaint No. 251208-26635675 was unreasonable as a matter of law.

### J. *Willfulness, Reckless Disregard, and Indicia of Malice*

41. Trans Union's conduct satisfies the willfulness standard under *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). A consumer reporting agency acts "willfully" when it "knowingly or recklessly" violates the FCRA. *Id.* at 56–57. A violation is reckless when the agency's conduct "is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69. Willfulness is also established where a consumer reporting agency fails to follow its own internal procedures. See *Williams v. First Advantage LNS Screening Sols.*, 947 F.3d 1298, 1309 (11th Cir. 2020). The following facts, taken together, establish knowing violation or reckless disregard: The Eleventh Circuit confirmed in Cahlin v. General Motors

Acceptance Corp., 936 F.2d 1151, 1161 (11th Cir. 1991), that punitive damages under the FCRA require proof that the defendant acted with "knowing or reckless disregard for the rights of others."

(a) Trans Union reported a "Last Payment Made" date contradicted by its own payment data—"Payment Received: $0," "Amount Paid: $0" every month, and "Scheduled Payment: $0" every month—all generated by its own systems, on the same tradeline, in the same report;

(b) Trans Union reported 90-to-120-day delinquency codes for seven consecutive months across three tradelines on accounts that the federal loan servicer has confirmed required no payment—reporting severe delinquency on accounts where no delinquency could legally exist;

(c) Trans Union reported delinquency on accounts whose underlying loans have been discharged by the United States Government ("Paid In Full By Claim")—no objectively reasonable interpretation of the FCRA permits reporting delinquency on a discharged obligation;

(d) The identical fabricated date "08/08/2023" was replicated across all three of Mathis's tradelines AND across the tradelines of Raheem Sanders—a separate consumer—evidencing systematic automated fabrication rather than isolated error;

(e) Trans Union's reinvestigation of CFPB Complaint No. 251208-26635675 affirmatively modified Mathis's file (updating address, adding opt-out preference) while affirmatively declining to correct the fabricated payment dates or the false

delinquency codes—despite having received Nelnet servicer records categorically proving no payments had ever been made;

(f) Trans Union exceeded the 30-day statutory deadline by seven days (37 days total) and failed to correct any substantive violations;

(g) Trans Union responded to four CFPB complaints filed between December 8, 2025 and December 26, 2025 with a combination of non-corrective "ACTIVE DISPUTE" notations, an outright refusal citing "litigation involved," and a burden-shifting directive to contact inquiring companies directly—none of which constitutes a reasonable reinvestigation under 15 U.S.C. § 1681i;

(h) Trans Union's escalating pattern of noncompliance—from inadequate reinvestigation to outright refusal to burden-shifting—demonstrates a deliberate corporate decision to deny Mathis her statutory right to dispute resolution during the pendency of this litigation;

(i) Members of Congress warned Trans Union in May 2020 about student loan reporting failures affecting millions of borrowers—the precise category of violations at issue; and

(j) Trans Union has made no corrections to Mathis's file during the pendency of this federal litigation, despite having been served with the original Complaint (Doc. 1), the First Amended Complaint (Doc. 29), the Court's Order (Doc. 32) identifying the surviving claims, and four CFPB complaints containing servicer proof of the falsity of the reported data.

### K. *Violations of the Alabama Deceptive Trade Practices Act*

42. Trans Union is a commercial enterprise that sells consumer reports as a product in exchange for fees from creditors. Trans Union's consumer reports constitute "goods" or "services" offered in "trade or commerce" within the meaning of the Alabama Deceptive Trade Practices Act ("ADTPA"), Ala. Code §§ 8-19-1 et seq. The Alabama Legislature enacted the ADTPA to provide "a strong and effective consumer protection program to protect the interest of both the consuming public and legitimate business person." Ala. Code § 8-19-2. The ADTPA is to be "construed liberally" to effectuate its protective purpose. Id.

43. Trans Union engaged in the following deceptive acts and practices in violation of Ala. Code § 8-19-5:

   (a) Representing that consumer reports had characteristics, uses, and benefits they did not have—specifically, that reports were accurate and reliable when they contained fabricated "Last Payment Made" dates contradicted by Trans Union's own $0 payment data, false delinquency codes on accounts the federal servicer confirms required no payment, and delinquency reported on obligations discharged by the United States Government, in violation of § 8-19-5(5);

   (b) Representing that consumer reports were of a particular standard or quality when they were not—Trans Union's reports purported to comply with Metro 2® Format standards and FCRA accuracy requirements when they contained fabricated payment dates violating the Field 18/26 correlation requirement, false delinquency codes on discharged and forbearance accounts, and missing Special Comment Codes failing to explain account transitions, in violation of § 8-19-5(7); and

27

(c) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce—including "verifying" fabricated data after being provided Nelnet servicer records proving no payments had ever been made, exceeding statutory reinvestigation deadlines, refusing to reinvestigate citing a nonexistent "litigation exception," and continuing to sell reports containing known fabrications to creditors for profit, in violation of § 8-19-5(27).

44. Trans Union's deceptive conduct was willful. Trans Union possessed Nelnet servicer records proving no payments had ever been made yet made no corrections. Trans Union's response to a detailed CFPB dispute noting the fabricated data was merely "ACTIVE DISPUTE"—no deletions, no corrections. Trans Union continued selling reports containing known fabrications to creditors during active federal litigation. This conduct was not inadvertent or negligent—it was deliberate and sustained.

45. The ADTPA claim is not preempted by the FCRA, for three independent reasons. First, Trans Union raised preemption in its response opposing the First Amended Complaint (Doc. 31). The Court characterized Trans Union's preemption argument as a "passing reference" and did not adopt it. Doc. 32. Trans Union bears the burden of establishing preemption as an affirmative defense; it has not done so. Second, the FCRA's preemption provision at 15 U.S.C. § 1681h(e) does not bar state law claims where the plaintiff demonstrates "malice or willful intent to injure such consumer." As set forth in Section J above, Mathis has demonstrated malice through ten independent indicia of willfulness—including fabrication of payment dates contradicted by the federal loan servicer's definitive records, reporting delinquency on government-discharged obligations, verification of fabricated data during active federal litigation despite being

28

provided Nelnet servicer records proving no payments had ever been made, and an escalating pattern of noncompliance across four CFPB complaints. See Cushman v. Trans Union Corp., 115 F.3d 220, 227 (3d Cir. 1997) (actions on the "same order as willful concealments or misrepresentations" satisfy malice standard). Third, § 1681h(e) by its terms applies only to actions "in the nature of defamation, invasion of privacy, or negligence." The ADTPA is none of these. The ADTPA is a statutory consumer protection scheme prohibiting deceptive commercial practices—specifically, the sale of a product (consumer reports) represented as accurate when the seller's own records and the federal loan servicer's records establish it contains fabricated data. A claim for selling a defective product under a consumer fraud statute is categorically distinct from a claim for reputational harm under defamation law. The FCRA's qualified immunity for defamation-type claims does not extend to a state statutory scheme designed to protect consumers from deceptive trade practices. Trans Union is a Delaware limited liability company headquartered in Chicago, Illinois, with no physical place of business in Alabama. Trans Union nonetheless engaged in "trade or commerce" in Alabama by selling consumer reports containing Mathis's fabricated data to Alabama creditors, including NCC Perkins Motor Plex, Huntington Bank, Ally Financial, First Premier Bank, Family Security Credit Union, and Capital One, collecting fees for each report. Physical presence is not required under the ADTPA; deceptive conduct affecting Alabama consumers suffices. Ala. Code § 8-19-3(8).

### L. *Publication of Defamatory Falsehoods with Malice*

46. Trans Union published false statements of fact to six creditors between November 2023 and May 2024. Specifically, Trans Union communicated that Mathis made a payment on her

student loan accounts on August 8, 2023. This statement was false. Nelnet's servicer records categorically state: "No payments have been made to your Nelnet-serviced account at this time." Trans Union also disseminated false delinquency codes showing Mathis as 90 to 120 days delinquent for seven months on accounts that the federal loan servicer confirms required no payment and on which four underlying loans have been discharged by the United States Government—creating a materially false impression of Mathis's creditworthiness. Each dissemination to a creditor constitutes a separate publication. Under longstanding American law, "a person is injured when a defamatory statement 'that would subject him to hatred, contempt, or ridicule' is published to a third party." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 432 (2021).

47. Under Alabama law, a statement is defamatory per se if it injures the plaintiff in his or her business, trade, or profession. See Ala. Code § 6-5-182. A fabricated "Last Payment Made" date combined with false 90-to-120-day delinquency codes creates the false impression that the borrower made a payment over a year ago and then defaulted into severe delinquency—imputing financial irresponsibility. For Mathis, this injury is particularly acute: Mathis's professional objective is to establish a family-owned Drug and Alcohol Abuse Rehabilitation Center, a business that requires financing. The publication of fabricated payment data and false delinquency codes on the credit report of a prospective business owner directly impedes access to the financing upon which her professional objective depends.

Because the false statements are defamatory per se, damages are presumed under Alabama law without proof of specific monetary loss. Ala. Code § 6-5-186. Where a statement is defamatory

per se, "the law presumes that damages have been suffered and they need not be proved." *Delta Health Grp., Inc. v. Stafford*, 887 So. 2d 887, 898 (Ala. 2004).

49. Satisfaction of the Malice Standard Under § 1681h(e). The FCRA provides qualified immunity for defamation claims against consumer reporting agencies at 15 U.S.C. § 1681h(e), unless the plaintiff demonstrates "malice or willful intent to injure such consumer." Mathis has demonstrated malice through the following facts:

(a) Trans Union fabricated a "Last Payment Made" date contradicted by its own payment data—and by the federal loan servicer's definitive records;

(b) Trans Union reported false delinquency codes on accounts the federal servicer confirms required no payment and on which four underlying loans have been discharged by the United States Government;

(c) Trans Union "verified" the fabricated data after Mathis provided Nelnet servicer records categorically proving no payments had ever been made;

(d) Trans Union exceeded the statutory reinvestigation deadline (37 days) and took no corrective action;

(e) Trans Union continued reporting the fabricated payment date and false delinquency codes during the pendency of this federal litigation; and

(f) Members of Congress warned Trans Union in May 2020 about student loan reporting failures affecting millions of borrowers—the precise category of violations at issue—yet Trans Union took no corrective action.

50. The combination of data fabrication, false delinquency reporting on discharged obligations, post-notice verification of known falsity, and continued publication during litigation constitutes conscious disregard for the accuracy of the reported data and deliberate

31

indifference to the resulting harm to Mathis within the meaning of *Safeco*, 551 U.S. at 57. This satisfies the § 1681h(e) malice exception and entitles Mathis to both presumed compensatory damages and punitive damages under Alabama law. Alabama imposes no statutory cap on punitive damages for intentional torts involving malice.

**M. *Damages Computation and Supporting Authorities***

51. Plaintiff alleges 58 discrete willful violations of the FCRA. Under 15 U.S.C. § 1681n(a)(1)(A), a consumer may recover "any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000." The Eleventh Circuit has held that consumers "do not have to prove actual damages in order to recover statutory damages based on alleged willful violations" of the FCRA. *Santos v. Healthcare Revenue Recovery Grp., LLC*, 90 F.4th 1144, 1154 (11th Cir. 2024) (per curiam). The 58 violations are as follows:

| Violation Category | Count | Rate | Amount |
|---|---|---|---|
| §1681e(b): 6 disseminations × 3 tradelines (fabricated payment date) | 18 | $1,000 | $18,000 |
| §1681e(b): False delinquency on discharged/forbearance accounts × 6 disseminations | 6 | $1,000 | $6,000 |
| §1681e(b): Fabricated payment activity on 4 government-discharged loans | 4 | $1,000 | $4,000 |
| §1681e(b): Failure to reflect current discharge/forbearance statuses × 3 tradelines | 3 | $1,000 | $3,000 |
| §1681i: CFPB #26635675 — timeline violation (37 days) | 1 | $1,000 | $1,000 |
| §1681i: 3 accts × 1 dispute — verification failure | 3 | $1,000 | $3,000 |
| §1681i: 3 accts × 1 dispute — deletion failure | 3 | $1,000 | $3,000 |

| | | | |
|---|---|---|---|
| §1681i: CFPB #26635675 — false delinquency unremediated despite servicer proof (3 tradelines) | 3 | $1,000 | $3,000 |
| §1681i: CFPB #27213175 — reinvestigation failure ("ACTIVE DISPUTE", no corrections) | 1 | $1,000 | $1,000 |
| §1681i: CFPB #27213236 — blanket refusal (Portfolio Recovery) | 1 | $1,000 | $1,000 |
| §1681i: CFPB #27213448 — burden-shifting response (hard inquiries) | 1 | $1,000 | $1,000 |
| §1681i: Portfolio Recovery — 7 Metro 2 violations unreinvestigated | 7 | $1,000 | $7,000 |
| §1681i: 4 CFPB complaints — refusal to update discharge/forbearance statuses | 4 | $1,000 | $4,000 |
| §1681i: Failure to update account statuses to reflect March 2020 administrative forbearance × 3 tradelines (evidence of false delinquency reporting, not standalone field claim) | 3 | $1,000 | $3,000 |
| FCRA STATUTORY SUBTOTAL | 58 | | $58,000 |

52. Plaintiff further seeks punitive damages under 15 U.S.C. § 1681n(a)(2). The Supreme Court has identified three "guideposts" for evaluating punitive damages: (1) the degree of reprehensibility; (2) the ratio of punitive to compensatory damages; and (3) comparable civil penalties. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003). All three guideposts support a substantial punitive award. As to reprehensibility, Trans Union fabricated data, reported false delinquency on government-discharged obligations, verified known falsity after receiving servicer proof, refused reinvestigation citing a nonexistent statutory exception, and continued publication during active federal litigation—conduct satisfying four of the

33

five *State Farm* reprehensibility factors. 538 U.S. at 419. As to ratio, the Supreme Court has observed that "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety," *id.* at 425, while acknowledging that higher ratios may be justified where "a particularly egregious act has resulted in only a small amount of economic damages." *Id.* The Eleventh Circuit has upheld FCRA punitive-to-statutory ratios of 7:1 or higher where willfulness is established. See *Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 153 (4th Cir. 2008) (approving significant punitive multiplier in FCRA context). At a 7:1 ratio applied to the $58,000 statutory base, FCRA punitive damages total $406,000. In Williams v. First Advantage LNS Screening Solutions, Inc., No. 1:17-cv-04547 (N.D. Ga.), a jury awarded $1,000,000 in punitive damages for less egregious FCRA violations involving a single inaccurate tradeline. Trans Union committed 58 violations across seven tradelines disseminated to six creditors—conduct that is more egregious than the single-tradeline violation in Williams.

53. Plaintiff seeks treble damages under the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-10. Treble damages for willful ADTPA violations are mandatory, not discretionary. See Ala. Code § 8-19-10(a)(2) ("the court shall award . . . not more than three times the actual damages sustained"). The Alabama Supreme Court has held that treble damages under the ADTPA serve both compensatory and deterrent functions and are available where the defendant's conduct was willful. See *Boles v. Blackstock Ford-Lincoln-Mercury, Inc.*, 476 So. 2d 85, 88 (Ala. 1985). Using the $58,000 FCRA statutory damages as the measure of actual harm, ADTPA treble damages total $174,000.

54. Plaintiff seeks presumed compensatory and punitive damages for defamation per se under Alabama law. Under Alabama law, "where a statement is defamatory per se, the law presumes that damages have been suffered and they need not be proved." *Delta Health Grp., Inc. v. Stafford*, 887 So. 2d 887, 898 (Ala. 2004). The Alabama Supreme Court has recognized that defamation imputing financial irresponsibility to a business professional constitutes injury of the highest order. See Ala. Code § 6-5-182. Mathis's professional objective of establishing a family-owned Drug and Alcohol Abuse Rehabilitation Center—an enterprise requiring substantial capital financing—renders the reputational harm from Trans Union's fabricated payment date and false delinquency codes on discharged and forbearance accounts categorically severe. The evidence warrants presumed compensatory damages in the range of $150,000 to $500,000. Punitive damages for defamation with malice, given the reprehensibility of the conduct, warrant an award in the range of $500,000 to $2,000,000. Alabama imposes no statutory cap on punitive damages for intentional torts involving malice. See Ala. Code § 6-11-21(a) (punitive damage limitations inapplicable to intentional torts).

55. Plaintiff seeks actual and emotional distress damages. Mathis has suffered real, substantial, and ongoing emotional harm including heightened anxiety about her financial future, frustration at the inability to access fair credit terms, and distress at watching the same systemic failures that impacted her parents now impacting her own financial life. The emotional harm is compounded by Mathis's direct observation of financial hardship experienced by her parents and grandmothers, and the recognition that the same institutional failures are now impeding her own financial advancement. As set forth in Paragraph 29, Mathis's credit inquiries progressed from three mainstream creditors to a

35

subprime lender within twenty-seven days. See Exhibit E (Declaration of Diondre Mathis Sr.).

56. The complete damages computation, reflecting the midpoint of reasonable estimates as a good faith representation of Plaintiff's claims, is as follows:

| Damages Category | Low Estimate | High Estimate | Midpoint |
|---|---|---|---|
| FCRA Statutory (58 violations) (15 U.S.C. § 1681n(a)(1)(A), $100-$1,000 per violation) | $58,000 | $58,000 | $58,000 |
| FCRA Punitive (7:1 ratio per BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996); State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) (single-digit multiplier)) | $406,000 | $406,000 | $406,000 |
| ADTPA Treble Damages (Ala. Code § 8-19-10(a)(2), mandatory for willful violations) | $174,000 | $174,000 | $174,000 |
| Defamation Presumed Compensatory (Delta Health Grp. v. Stafford, 887 So. 2d 887 (Ala. 2004); Ala. Code § 6-5-182) | $150,000 | $500,000 | $325,000 |
| Defamation Punitive (no statutory cap; Ala. Code § 6-11-21 inapplicable to intentional torts) | $500,000 | $2,000,000 | $1,250,000 |
| Emotional Distress / Actual (Levine v. World Fin. Network Nat. Bank, 437 F.3d 1118 (11th Cir. 2006)) | $50,000 | $100,000 | $75,000 |
| TOTAL | $1,338,000 | $3,238,000 | $2,288,000 |

57. Plaintiff adopts the midpoint of the foregoing range, yielding total damages of $2,288,000. This figure reflects neither the minimum nor the maximum recoverable under the claims set forth herein, but represents Plaintiff's good faith assessment pursuant to Federal Rule of Civil Procedure 11(b)(3). All amounts remain subject to proof at trial, and Plaintiff reserves the right to seek damages up to and including the maximum supportable under

each theory. This approach is consistent with the range of FCRA damages upheld by courts in this Circuit. See Williams v. First Advantage LNS Screening Solutions, Inc., No. 1:17-cv-04547 (N.D. Ga.) ($1,000,000 punitive award for less egregious single-tradeline FCRA violation); Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151, 1161 (11th Cir. 1991) (affirming punitive damages where defendant acted with knowing or reckless disregard).

## COUNTS

### Count I: Willful Violation of 15 U.S.C. § 1681e(b)

58. Plaintiff incorporates all preceding paragraphs by reference.

59. Trans Union willfully failed to follow reasonable procedures to assure maximum possible accuracy by reporting fabricated "Last Payment Made: 08/08/2023" dates contradicted by $0 payment data on all three tradelines, reporting false 90-to-120-day delinquency codes on accounts that the federal loan servicer has confirmed required no payment and on which four underlying loans have been discharged by the United States Government, failing to reflect current loan statuses of "Paid In Full By Claim" and "No-Pay Hardship Forbearance," and disseminating these inaccurate reports to six creditors. Trans Union's conduct was willful under *Safeco*, 551 U.S. at 57, because no objectively reasonable interpretation of the FCRA permits a consumer reporting agency to publish a "Last Payment Made" date that is contradicted by its own $0 payment data on the same tradeline, or to report delinquency on accounts designated "Paid In Full By Claim" or

"No-Pay Hardship Forbearance" by the federal loan servicer. The inaccuracy is apparent on the face of Trans Union's own records without reference to any external source, establishing per se unreasonableness under *Losch*, 995 F.3d at 944. Plaintiff seeks statutory damages of $100 to $1,000 per violation under 15 U.S.C. § 1681n(a)(1)(A)—for which no proof of actual damages is required, *Santos*, 90 F.4th at 1154—punitive damages under § 1681n(a)(2), and costs.

### Count II: Negligent Violation of 15 U.S.C. § 1681e(b) (Alternative)

60. Plaintiff incorporates all preceding paragraphs by reference.

61. In the alternative, Trans Union negligently failed to follow reasonable procedures. Plaintiff seeks actual damages and costs under 15 U.S.C. § 1681o.

### Count III: Willful Violation of 15 U.S.C. § 1681i

62. Plaintiff incorporates all preceding paragraphs by reference.

63. Mathis filed CFPB Complaint No. 251208-26635675 identifying the fabricated payment dates, false delinquency codes, and internal data contradictions, and providing Nelnet servicer records proving no payments had ever been made. Trans Union exceeded the 30-day statutory deadline imposed by § 1681i(a)(1)(A) by seven days (37 days total). Trans Union noted "ACTIVE DISPUTE" on each tradeline without cross-referencing its own internal records or the servicer evidence provided, and failed to delete unverifiable information as required by § 1681i(a)(5)(A). Trans Union responded to three additional

CFPB complaints filed December 26, 2025 (Nos. 251227-27213175, 251227-27213236, and 251227-27213448) as follows: for No. 251227-27213175, Trans Union again noted "ACTIVE DISPUTE" and made no corrections to any tradeline; for No. 251227-27213236, Trans Union refused to reinvestigate entirely, citing "litigation involved"—a ground for which no statutory basis exists under the FCRA; and for No. 251227-27213448, Trans Union directed Mathis to contact the inquiring companies directly without conducting any reinvestigation. Trans Union's reinvestigation of the first complaint constituted "merely parroting information received from other sources" in violation of *Cushman*, 115 F.3d at 225, and its responses to the remaining three complaints each independently violate the mandatory reinvestigation obligation. See *Collins*, 775 F.3d at 1336. Plaintiff seeks statutory damages, punitive damages, and costs under 15 U.S.C. § 1681n.

### Count IV: Negligent Violation of 15 U.S.C. § 1681i (Alternative)

64. Plaintiff incorporates all preceding paragraphs by reference.

65. In the alternative, Trans Union negligently failed to conduct a reasonable reinvestigation. Plaintiff seeks actual damages and costs under 15 U.S.C. § 1681o.

### Count V: Alabama Deceptive Trade Practices Act

*(Ala. Code §§ 8-19-5(5), (7), and (27))*

66. Plaintiff incorporates all preceding paragraphs by reference.

67. Trans Union is engaged in "trade or commerce" as defined by Ala. Code § 8-19-3(8). Trans Union sells consumer reports as a commercial product to creditors in exchange for fees. Trans Union sold reports containing Mathis's fabricated payment date and false delinquency codes to NCC Perkins Motor Plex, Huntington Bank, Ally Financial, First Premier Bank, Family Security CU, and Capital One, collecting fees for each report.

68. Trans Union's conduct constitutes deceptive acts and practices prohibited by Ala. Code § 8-19-5:

(a) Under § 8-19-5(5): Trans Union represented that its consumer reports had characteristics, uses, and benefits they did not have—namely, accuracy and reliability—when the reports contained fabricated "Last Payment Made" dates contradicted by Trans Union's own $0 payment data and false delinquency codes on accounts the federal servicer confirms required no payment;

(b) Under § 8-19-5(7): Trans Union represented that its consumer reports were of a particular standard or quality—compliant with Metro 2® Format standards and FCRA accuracy requirements—when they contained fabricated payment dates violating the Field 18/26 correlation requirement, false delinquency codes on discharged and forbearance accounts, and missing Special Comment Codes; and

(c) Under § 8-19-5(27): Trans Union engaged in unconscionable, false, misleading, and deceptive acts including: "verifying" fabricated data after being provided Nelnet servicer records proving no payments had ever been made; exceeding the statutory reinvestigation deadline by 7 days; refusing to reinvestigate citing a nonexistent "litigation exception"; and continuing to sell reports containing known fabrications during active federal litigation.

40

69. Trans Union's deceptive conduct was willful, entitling Plaintiff to treble damages under Ala. Code § 8-19-10(a)(2). Here, every factor favors treble damages: Trans Union committed 58 violations across three tradelines disseminated to six creditors; Congressional notice in May 2020 placed Trans Union on warning that millions of student loan borrowers were affected; and the conduct was intentional as demonstrated by fabrication, false delinquency reporting on discharged obligations, post-notice verification of known falsity, and continued publication during litigation. Plaintiff seeks actual damages, treble damages, and costs.

70. This claim is not preempted by the FCRA. The Court declined to adopt Trans Union's preemption defense, characterizing it as a "passing reference." Doc. 32. The § 1681h(e) malice exception preserves state law claims where malice or willful intent to injure is demonstrated, as set forth herein. Moreover, § 1681h(e) applies by its terms only to actions "in the nature of defamation, invasion of privacy, or negligence"—the ADTPA is a statutory consumer protection scheme prohibiting deceptive commercial practices, not a defamation action. Trans Union's sale of consumer reports containing fabricated data to Alabama creditors constitutes deceptive trade or commerce in Alabama regardless of Trans Union's physical location in Chicago, Illinois. Ala. Code § 8-19-3(8). Trans Union bears the burden of establishing preemption as an affirmative defense and has failed to do so.

## Count VI: Defamation Per Se with Malice

*(15 U.S.C. § 1681h(e) Malice Exception)*

41

71. Plaintiff incorporates all preceding paragraphs by reference.

72. Trans Union published to NCC Perkins Motor Plex, Huntington Bank, Ally Financial, First Premier Bank, Family Security CU, and Capital One the false statement that Mathis made a payment on her student loan accounts on August 8, 2023. Mathis made no such payment. Nelnet's servicer records state: "No payments have been made to your Nelnet-serviced account at this time." Nelnet's CFPB response (Exhibit S-3) independently confirms that no payments were ever received on Mathis's account. Trans Union further disseminated false delinquency codes showing 90-to-120-day delinquency on accounts the federal servicer confirms required no payment and on which four underlying loans have been discharged by the United States Government—creating a materially false impression of Mathis's creditworthiness to any reasonable creditor.

73. The false statements are defamatory per se under Alabama law because they impute financial irresponsibility to Mathis and injure her in her business, trade, and profession. See Ala. Code § 6-5-182. A fabricated "Last Payment Made" date combined with false delinquency codes creates the false impression that the borrower made a payment and then defaulted into severe delinquency—imputing financial irresponsibility. Mathis's professional objective is to establish a family-owned Drug and Alcohol Abuse Rehabilitation Center—a business requiring financing. The publication of fabricated credit data and false delinquency codes on the credit report of a prospective business owner directly impedes access to the financing upon which her professional objective depends.

74. Section 1681h(e) provides that "no consumer may bring any action or proceeding in the nature of defamation . . . with respect to the reporting of information against any

42

consumer reporting agency . . . except as to false information furnished with malice or willful intent to injure such consumer." 15 U.S.C. § 1681h(e). Trans Union acted with malice or willful intent to injure as required to overcome this qualified privilege. Trans Union's conduct satisfies this standard through: (a) fabricating data contradicted by Trans Union's own internal records and the federal loan servicer's records; (b) reporting false delinquency codes on accounts the servicer confirms required no payment and on which four loans have been discharged by the federal government; (c) "verifying" fabricated data after receiving Nelnet servicer records proving no payments had ever been made; (d) exceeding the statutory reinvestigation deadline; (e) continuing to publish the fabricated data during the pendency of this federal lawsuit; and (f) ignoring Congressional warnings about the precise category of student loan reporting failures at issue.

75. Because the false statements are defamatory per se, compensatory damages are presumed under Alabama law without proof of specific monetary loss. Plaintiff further seeks punitive damages for the malicious and willful nature of Trans Union's conduct. Alabama imposes no statutory cap on punitive damages for intentional torts involving malice. The constitutional limits on punitive damages under *State Farm*, 538 U.S. at 425, are satisfied here given the extreme reprehensibility of Trans Union's conduct—fabrication, false delinquency reporting on discharged obligations, verification of known falsity, and continued publication during litigation.

## **PRAYER FOR RELIEF**

The material facts underlying this action are established by Trans Union's own records and the federal loan servicer's records, and are not subject to genuine dispute. Trans Union's own consumer disclosure report states "Last Payment Made: 08/08/2023" on all three student loan tradelines. Trans Union's own payment history grids show $0 paid for August 2023 on each of those tradelines. Nelnet, the federal loan servicer, confirms: "No payments have been made to your Nelnet-serviced account at this time." Nelnet confirms four of Mathis's loans were discharged by the United States Government ("Paid In Full By Claim") and three are in no-pay hardship forbearance requiring zero payments. Trans Union reported Mathis as 90-to-120 days delinquent on accounts the federal government and the loan servicer confirm required no payment. The CFPB portal confirms Trans Union responded to four separate disputes with a combination of non-corrective "ACTIVE DISPUTE" notations, an outright refusal citing "litigation involved," and a burden-shifting directive—none of which constitutes a reasonable reinvestigation under 15 U.S.C. § 1681i. No extrinsic evidence is required to establish any of these facts. Each is provable from documents Trans Union itself generated or from official federal servicer records already in the Court's record. Plaintiff reserves the right to move for summary judgment under Federal Rule of Civil Procedure 56 at the appropriate time on any or all claims where the undisputed material facts establish liability as a matter of law.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and award total damages in the amount of $2,288,000, comprising:

(a) Statutory damages of not less than $100 and not more than $1,000 per violation under 15 U.S.C. § 1681n(a)(1)(A);

(b) Punitive damages under 15 U.S.C. § 1681n(a)(2);

(c) Actual damages for lost business opportunities and emotional distress;

(d) Treble damages under the ADTPA, Ala. Code § 8-19-10;

(e) Presumed compensatory and punitive damages for defamation per se;

(f) Pre-judgment and post-judgment interest;

(g) Reasonable attorney's fees under 15 U.S.C. § 1681n(a)(3) and Ala. Code § 8-19-10(a);

(h) Costs of this action; and

(i) Such other relief as this Court deems just and proper.


## DEMAND FOR JURY TRIAL


Plaintiff demands trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.


Respectfully submitted,


Dated: 03/02 , 2026


**DIYANA MATHIS, Pro Se Plaintiff**
404 Brown Street
Tuskegee, Alabama 36083
Email: ybtheknight@gmail.com
Telephone: (334) 938-9171


45

**UNITED STATES DISTRICT COURT**

**FOR THE MIDDLE DISTRICT OF ALABAMA**

_____ **DIVISION**

**CERTIFICATE OF SERVICE**

I, Diyana Mathis, do hereby Certify that a true and correct copy of the foregoing has been furnished by email (manner of service, i.e., U.S. Mail, electronic mail, etc.) on this _2_ day of _March_ 2026, to:

James Allen Sydnor, Jr.
Asydnor@huielaw.com

William Thomas Thompson
wthompson@huielaw.com

___03/02/2026___          ___Diyana Mathis___

Date                                    Signature

46